Filed 5/20/13  P. v. Givens CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070625 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F07850) |
| v. | |
| ISAAC MARINO GIVENS, | |
| Defendant and Appellant. | |
| THE PEOPLE, | C070924 |
| Plaintiff and Respondent, | (Super.Ct.No. 10F07850) |
| v. | |
| CESAR SANTANA, | |
| Defendant and Appellant. | |

For their part in a continuing violent rivalry between subsets of the Norteño gang, defendants Cesar Santana and Isaac Givens were found guilty by jury of shooting at an

1

inhabited dwelling (Pen. Code,[1] § 246) for the benefit of a criminal street gang (§ 186.22, subd. (b)(4)). Both were sentenced to 15 years to life in state prison. On appeal, Santana contends the trial court abused its discretion in denying him probation because his was an unusual case, and his sentence of 15 years to life is cruel or unusual. Givens joins the second contention and also contends the trial court violated the ex post facto prohibition by imposing a $240 restitution fine when the applicable minimum was $200. Disagreeing, we shall affirm.

**FACTS**

Most Hispanic gang violence in Sacramento, a predominately Norteño city, is between various subsets of Norteños as the subsets seek to establish the pecking order. Among the Norteño subsets are the Varrio Diamonds, the 14th Avenue Norteños, and the Fruitridge Vista. The 14th Avenue and Fruitridge Vista subsets are aligned. Santana is a member of the 14th Avenue Norteños and Givens is a member of the Fruitridge Vista subset.

A rivalry between the Varrio Diamonds and the 14th Avenue subsets began in 2005 when a 14th Avenue gang member shot and killed a Varrio Diamond gang member. The rivalry was dormant for a number of years, but began again in 2009 with drive-by shootings. It continued on December 3, 2010, when three men, Givens, Perez, and Garay, entered a convenience store and encountered two Varrio Diamonds. One of the Varrio Diamonds, Andrew Martin, shot Garay

On December 8, 2010, gang detectives were conducting surveillance of 7432 17th Avenue, the home of Martin's grandmother, looking for Martin. The detective closest to the house saw a silver car slow as it approached 7432 and then pull to the curb. Santana, the passenger, got out and walked to 7432. There, he pulled a handgun from his

---

[1] Further undesignated statutory references are to the Penal Code.

waistband, pointed it at the house, and fired five or six times. Santana put the gun back in his waistband, looked around the ground and picked up items (presumably shell casings) and walked quickly back to the car and got in. Givens, in the driver's seat, drove away.

There were six adults and a toddler in the house. No one was injured. There were bullet holes in the front window and front gutter. The residents found a bullet in the house and turned it over to the police.

As the silver car pulled out, the detective alerted the other members of the surveillance team. Various officers followed the car on a high-speed pursuit. The car crashed into a tree as it tried to turn left. Givens was immediately detained, but Santana fled on foot. He was finally captured in a garage.

A backpack found in the car contained two loaded nine-millimeter handguns. One of the guns could have been the gun involved in the shooting. Particles of gunshot residue were found on gloves that Santana wore; this finding was consistent with his firing a gun.

A gang detective testified to defendants' gang membership. Given a hypothetical based on the facts of this case, he opined the shooting was for the benefit of a gang.

## DISCUSSION

### I

*Denial of Probation*

Santana contends the trial court abused its discretion in denying him probation. He recognizes he was ineligible for probation under section 1203, subdivision (e)(2) unless the court found unusual circumstances, but argues such circumstances are present here. He stresses his youth, pointing out that he was 19 at the time of the shooting, and his insignificant criminal record--he had only a misdemeanor conviction for possession of a counterfeit item--and adds that no one was injured and there was no documented monetary loss, and that he had a supportive family and was working towards his GED.

3

"Except in unusual cases where the interests of justice would best be served if the person is granted probation, probation shall not be granted to . . . [a]ny person who used, or attempted to use, a deadly weapon upon a human being in connection with the perpetration of the crime of which he or she has been convicted." (§ 1203, subd. (e)(2).) California Rules of Court, rule 4.413(c) sets forth the facts which may indicate an "unusual case" in which probation may be granted. The only fact that arguably applies to Santana is "The defendant is youthful or aged, and has no significant record of prior criminal offenses." (Cal. Rules of Court, rule 4.413 (c)(2)(C).)

The trial court's findings as to whether there are unusual circumstances, as with the court's decision to grant or deny probation, is reviewed for an abuse of discretion. (*People v. Superior Court (Du)* (1992) 5 Cal.App.4th 822, 831 (*Du*); *People v. Cazares* (1987) 190 Cal.App.3d 833, 837.) "'An order denying probation will not be reversed in the absence of a clear abuse of discretion. [Citation.] In reviewing the matter on appeal, a trial court is presumed to have acted to achieve legitimate sentencing objectives in the absence of a clear showing the sentencing decision was irrational or arbitrary. [Citations.]' [Citation.]" (*People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1091.)

Here, the trial court noted Santana's relative youth and insignificant criminal history (he was on informal probation for his misdemeanor conviction), but noted that unlike many cases where the defendant had no positive role model, Santana had a mother and older brother who cared about him. This crime was not an isolated incident or his initiation to gang life. Santana had a lengthy history of gang involvement; he was the shooter and was armed as an assassin. There was testimony at trial that Santana had been present a year earlier at a similar drive-by shooting in the same area. The court found the nature, seriousness, and circumstances of the crime warranted a prison commitment.

Santana contends the trial court ignored factors affecting probation that were in his favor. "'A trial court may minimize or even entirely disregard mitigating factors without stating its reasons.' [Citation.] Further, unless the record affirmatively reflects

otherwise, the trial court will be deemed to have considered the relevant criteria, such as mitigating circumstances, enumerated in the sentencing rules. [Citation.]" (*People v. Zamora* (1991) 230 Cal.App.3d 1627, 1637.) The trial court could reasonably downplay Santana's stated willingness to comply with probation considering he was on informal probation when he fired at least five bullets into an occupied house. In denying Santana probation, the trial court clearly stated its reasons, properly focusing on the seriousness of Santana's offense and finding that he was a danger to others. (Cal. Rules of Court, rule 4.414(a)(1), (b)(8).) "We will not interfere with the trial court's exercise of discretion 'when it has considered all facts bearing on the offense and the defendant to be sentenced.' [Citation .]" (*People v. Downey* (2000) 82 Cal.App.4th 899, 910.)

Defendant relies on *Du, supra,* 5 Cal.App.4th 822, where a woman convicted of voluntary manslaughter with a firearm received probation, and argues the facts of his conviction are much less egregious. But the facts of *Du* are readily distinguishable. Further, exercise of discretion by its very nature suggests that different courts may reasonably arrive at different decisions, even on the same facts. (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1771; *People v. Littleton* (1992) 7 Cal.App.4th 906, 911, fn. 7.) Here, the trial court did not abuse its discretion in declining to grant defendant a probationary sentence.

II

*Cruel or Unusual Punishment*

Santana contends his sentence of 15 years to life where he was relatively young and no one was injured by his actions amounts to cruel or unusual punishment. He contends his counsel was deficient in failing to object to the unconstitutional sentence. Givens joins in this contention. He argues a sentence of 15 years to life for aiding and abetting a crime where no one was injured is cruel and unusual. He does not rely on his youth; he was 27 years old at the time of the crime.

*A.    The Law*

The Eighth Amendment of the United States Constitution prohibits imposition of a sentence that is "grossly disproportionate" to the severity of the crime.  (*Ewing v. California* (2003) 538 U.S. 11, 20-21 [155 L.Ed.2d 108, 118] (*Ewing*); *People v. Carmony* (2005) 127 Cal.App.4th 1066, 1076 (*Carmony*).)  Successful proportionality challenges are "exceedingly rare" in noncapital cases.  (*Ewing, supra*, 538 U.S. at pp. 20-21 [155 L.Ed.2d 108, 118] [sentence of 25 years to life for felony theft of golf clubs under California's three strikes law, with prior felonies of robbery and burglary, did not violate federal prohibition on cruel and unusual punishment].)

Whereas the federal Constitution prohibits cruel "and" unusual punishment, California affords greater protection to criminal defendants by prohibiting cruel "or" unusual punishment.  (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*); *Carmony, supra,* 127 Cal.App.4th 1066, 1085.)  Because the California Constitution's prohibition against cruel or unusual punishment is broader than the United States Constitution's prohibition, we analyze defendants' contention under the California standard only.  In California, a punishment may be cruel or unusual if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity."  (*Lynch, supra,* 8 Cal.3d at p. 424, fn. omitted.)  "The main technique of analysis under California law is to consider the nature both of the offense and of the offender.  [Citation.]  The nature of the offense is viewed both in the abstract and in the totality of circumstances surrounding its actual commission; the nature of the offender focuses on the particular person before the court, the inquiry being whether the punishment is grossly disproportionate to the defendant's individual culpability, as shown by such factors as age, prior criminality, personal characteristics, and state of mind."  (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494 (*Martinez*).)  In conducting our analysis, we pay particular attention to the degree of danger that the offense and the particular offenders present to society.  (*People v. Dillon* (1983) 34 Cal.3d 441, 479

6

(*Dillon*).) And we accord great deference to the Legislature, which has been given the role to define crimes and prescribe punishments. (*Dillon, supra,* 34 Cal.3d at p. 477.)

### B. Analysis

"Preliminarily, we note this is not [*Dillon*] [ ]. This was not the impulsive act of a frightened teenager against an armed criminal. This was a coldly premeditated crime where the participants had plenty of time to reflect on the consequences of their actions." (*People v. Ortiz* (1997) 57 Cal.App.4th 480, 486 [sentence of 26 years to life with possibility of parole after 15 years for 14 year old not cruel and unusual].) Here, as in *Ortiz*, defendants were well-armed and planned a violent attack upon an unknown number of persons purely for revenge and to assert the dominance of their gang. The public-safety parameter strongly favors the conclusion that the punishment here was not disproportionate to the crime.

Defendants stress that no one was injured in this case, but that happy fact appears to have been purely fortuitous. There is no evidence that Santana deliberately took steps to avoid injuring anyone, or that he or Givens had any concern for the consequences of their violent actions. Instead, the evidence shows Santana fired through the front window of a house while several people, including a small child, were inside.

Although their argument is not entirely clear, it appears defendants are arguing that the life sentence resulting from application of the gang enhancement constitutes cruel or unusual punishment. We disagree.

Courts have rejected the argument that the firearm enhancement of section 12022.53 constitutes cruel or unusual punishment. (*Martinez, supra,* 76 Cal.App.4th at pp. 494-496 [25 years to life on attempted murder]; *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1212-1215 [25 years to life on murder].) "Section 12022.53 as a whole represents a careful gradation by the Legislature of the consequences of gun use in the commission of serious crimes. The section is limited, in the first place, to convictions of certain very serious felonies." (*Martinez, supra,* at p. 495.) "The ease with which a

7

victim of one of the enumerated felonies could be killed or injured if a firearm is involved clearly supports a legislative distinction treating firearm offenses more harshly than the same crimes committed by other means, in order to deter the use of firearms and save lives. [Citations.]" (*Id*. at pp. 497-498.) We find the reasoning of these cases compelling and applicable to the Legislature's decision to punish gang-related shootings into inhabited homes harshly to deter violent crime. We find no constitutional infirmity in section 186.22, subdivision (b)(4).

Santana relies on cases holding sentencing a juvenile to life in prison without the possibility of parole (or its factual equivalent) is cruel or unusual punishment. (*Graham v. Florida* (2010) __ U.S. __ [176 L.Ed.2d 825]; *People v. Mendez* (2010) 188 Cal.App.4th 47.) These cases are easily distinguishable from this case because here, neither defendant is a juvenile, nor is the sentence life without the possibility of parole. After defendants have served 85 percent of the 15-year determinate portion of the sentence, they will be eligible for parole. The sentence imposed on defendants was neither cruel nor unusual.

Because we have found the 15 years to life sentences for each defendant were not cruel or unusual, their counsel were not ineffective in failing to challenge the constitutionality of the sentences.

### III

*Restitution Fine*

The trial court imposed a $240 restitution fine (§ 1202.4, subd. (b)(1)) and $240 parole revocation fine (§ 1202.45) on each defendant. Givens contends these fines violated the prohibition against ex post facto laws. Santana joins this contention. In 2010, when this crime was committed, the minimum amount of these fines was $200, but the minimum amount was raised to $240 effective in 2012. (Stats. 2011, ch. 358, § 1.) Givens contends the trial court "intended to impose the minimum fine permissible." He

8

contends the fines are unauthorized and may be corrected at any time, despite the lack of an objection. We disagree.

The ex post facto clauses of both the federal and state constitutions prohibit any statute which makes more burdensome the punishment for a crime after its commission. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 294, 295.) "A restitution fine qualifies as punishment for purposes of the prohibition against ex post facto laws. [Citation.]" (*People v. Saelee* (1995) 35 Cal.App.4th 27, 30.)

The flaw in Givens's argument is that in 2010 nothing prohibited a restitution fine of $240. Indeed, the probation reports for both defendants recommended a restitution fine of $10,000. "Although the cases are varied, a sentence is generally 'unauthorized' where it could not lawfully be imposed under any circumstance in the particular case. Appellate courts are willing to intervene in the first instance because such error is 'clear and correctable' independent of any factual issues presented by the record at sentencing. [Citation.]" (*People v. Scott* (1994) 9 Cal.4th 331, 354 (*Scott*).) The $240 fines could be lawfully imposed in 2010 and were not unauthorized.

Because the fines were not unauthorized, Givens forfeited any claim that the trial court mistakenly imposed more than the minimum fine by not raising it at the sentencing hearing. "Although the court is required to impose sentence in a lawful manner, counsel is charged with understanding, advocating, and clarifying permissible sentencing choices at the hearing. Routine defects in the court's statement of reasons are easily prevented and corrected if called to the court's attention. As in other waiver cases, we hope to reduce the number of errors committed in the first instance and preserve the judicial resources otherwise used to correct them." (*Scott*, *supra*, 9 Cal.4th at p. 353.) Here, had Givens raised the 2010 minimum fine amount below, the trial court could have corrected any error in the amount of the fine. Because he did not, he may not challenge the fine on appeal.

**DISPOSITION**

The judgment is affirmed.

                                      DUARTE         , J.

We concur:

        RAYE         , P. J.

        BUTZ         , J.