Timonte Deshaw HARRIS, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2002–SC–0651–MR.

Supreme Court of Kentucky.

May 20, 2004.

Emily Holt, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, Samuel J. Floyd, Jr., Assistant Attorney General, Frankfort, Counsel for Appellee.

Opinion of the Court by Justice COOPER.

Following a trial by jury in the Fayette Circuit Court, Appellant, Timonte Deshaw Harris, was convicted of wanton murder, KRS 507.020(1)(b), and sentenced to thirty years in prison. He appeals to this Court as a matter of right, Ky. Const. § 110(2)(b), asserting that (1) he was erroneously denied a directed verdict of acquittal due to the insufficiency of the evidence against him; (2) irrelevant and prejudicial evidence of a prior shooting of the victim by another person should have been excluded; (3) he was denied his constitutional right to prove that another person may have been the killer; (4) in response to a jury request that the testimony of a prosecution witness be replayed during deliberations, the trial judge erroneously denied Appellant's motion to replay the entire testimony of the witness; (5) the trial judge erroneously overruled his motion to strike a potential juror for cause; and (6) the prosecutor used peremptory strikes to excuse three potential African–American jurors in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). For the reasons explained in this opinion, we affirm.

## I. SUFFICIENCY OF THE EVIDENCE.

At approximately 8:30 p.m. on September 15, 2001, Jeffrey ("Eenie") Reed

was shot to death while driving a white Oldsmobile Achieva belonging to the mother of his cousin, Tyson Fee. Fee was riding as a passenger in the vehicle when the shooting occurred. Fee testified that another vehicle pulled behind them as they drove down Merino Street in Lexington and that someone in that vehicle began shooting at them. Fee attempted to return fire with his .357 magnum Smith & Wesson revolver, but was unsuccessful because there was no cartridge in the chamber. Reed was shot in the back but was able to stop and exit the vehicle before collapsing in the street. Fee drove to 710 Pine Street, the home of another cousin, and hid his revolver and car keys under a mattress. He then directed his cousin to call the police to report Reed's death. Because of darkness, Fee was unable to identify the vehicle from which the shots were fired or to recognize anyone in the vehicle. Two eyewitnesses testified that the shots came from a black vehicle chasing a white vehicle and that there appeared to be three people in the black vehicle. Appellant had access to a black Honda belonging to his mother.[1]

The Commonwealth's theory was that Appellant shot Reed as part of a cycle of revenge and retaliation between Reed and Fee on one side and Appellant and Dewan Mulazim on the other. Mulazim once described Appellant to the police as his "buddy" and "partner." In support of its theory, the Commonwealth first proved that on August 15, 2001, Reed and Mulazim were involved in an argument during which Reed knocked Mulazim to the ground and Mulazim retaliated by shooting Reed in the leg. Reed's girlfriend testified that on the night of September 14, 2001, Reed and Fee were at her apartment when they spotted Mulazim and Appellant in the neighborhood. She heard someone say, "Go get a gun," following which Reed and Fee left her residence. Shortly thereafter, she heard gunshots in the vicinity. Fee testified that on September 15th, he and Reed were parked in the white Oldsmobile when Appellant approached them on foot. Appellant accused Reed of shooting at him the previous evening. When Appellant reached in his pants as if to draw a gun, Reed started the vehicle, and he and Fee sped away.

Reed's cousin, Jeremiah Sullivan, testified that he encountered Appellant on the night of the shooting and that Appellant was waving a .9mm Glock pistol, saying, "I just got one of 'em" Appellant told Sullivan that "I rode on 'em ... Eenie and Tyson, chased 'em down," explaining that they had shot at him the previous night because he was with Mulazim, who had previously shot Reed. Appellant continued to exclaim, "Well, man, I got 'em, dog, I got 'em. I know I done hit one of them. They tried to kill me." Appellant described how he had driven up behind their vehicle while holding his gun in front of the windshield and shooting.

When police interviewed Mulazim on September 17, 2001, he denied being with Appellant on either the night of the 14th or the night of the 15th but revealed that a man nicknamed "Mal Viddy," whom he identified as a brother of Brian Brown, was driving the vehicle from which the shots that killed Reed were fired. The jury could have reasonably concluded that the three people the eyewitnesses observed in the black car were Appellant, Mulazim, and Horace ("Mal Viddy") Brown (who testified that he was not with Appellant when Reed was killed). At trial, Mu-

---

**1.** One of the eyewitness, however, described the black vehicle as a two-door car with gold rims whereas other evidence indicated that the black Honda owned by Appellant's mother was a four-door car without gold rims.

lazim testified that he had "made up" the story about "Mal Viddy," but admitted that he had shot Reed on August 15th and that someone had shot at him and Appellant on the night of September 14th.

The police found three bullet holes in Fee's white Oldsmobile. The fatal bullet passed through the license plate holder, the trunk, the rear seat, the driver's seat, and Reed's body. The bullet was not found, but the police discovered six .9mm shell casings at the crime scene. Neither was the murder weapon found, but a ballistics expert testified that all six casings were fired from the same Glock .9mm pistol. The medical examiner who performed the autopsy testified that the entrance wound of the bullet into Reed's body was consistent with a wound caused by a medium-sized bullet, such as a .9mm bullet.

Thus, the Commonwealth proved motive, opportunity, and an admission of guilt, substantiated by physical evidence. This evidence was sufficient for a reasonable jury to find beyond a reasonable doubt that Appellant fired the shot that killed Jeffrey Reed. *Commonwealth v. Benham,* Ky., 816 S.W.2d 186, 187 (1991).

## II. PRIOR SHOOTING.

■ Appellant asserts that evidence of the August 15, 2001, confrontation between Reed and Mulazim should have been excluded as irrelevant. We disagree. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Relevant evidence in a criminal case is any evidence that tends to prove or disprove an element of the offense. *Commonwealth v. Mattingly,* Ky.App., 98 S.W.3d 865, 869 (2003) (citations omitted). To satisfy the test of relevance, only a slight increase in probability must be shown. *Springer v. Commonwealth,* Ky., 998 S.W.2d 439, 449 (1999). Furthermore:

> An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. It need not even make that proposition appear more probable than not.... It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable.

*Turner v. Commonwealth,* Ky., 914 S.W.2d 343, 346 (1996) (citations omitted). The evidence that Mulazim shot Reed on August 15th provided the motive for Reed and Fee to shoot at Mulazim and Appellant on September 14th, which provided the motive for Appellant to shoot and kill Reed on September 15th.

■ Appellant also claims that KRE 404(b) somehow required suppression of this evidence. However, that rule applies only to evidence of prior misconduct by the person against whom the evidence is offered for the purpose of showing that person's subsequent action in conformity therewith. Appellant did not commit the August 15th shooting of Reed. Thus, there is no need for a KRE 404(b) analysis. *Springer v. Commonwealth, supra,* at 449 n. 1 (contention that introduction of sibling's bad acts violates KRE 404(b) implausible).

## III. ALTERNATIVE PERPETRATOR EVIDENCE.

■ Reed had previously been convicted of one count of trafficking in a controlled substance in the first degree. Although the post mortem examination revealed no drugs in his system, a small amount of marijuana was found during the search of

the white Oldsmobile (which, of course, belonged to Fee's mother, not Reed). Additionally, drug paraphernalia such as plastic bags, scales, and crack pipes, along with some stolen property, were found at 710 Pine Street (where Fee had fled after the shooting). The Commonwealth filed two motions in limine to exclude this evidence for lack of probative value. The trial court sustained both motions. Appellant contends that the exclusion of this evidence interfered with his right to present a defense by denying him the opportunity to assert that someone else killed Reed. He claims that it is common knowledge that the drug underworld is dangerous, and if Reed were involved in the drug trade, many people may have had a motive to kill him.

The Due Process Clause affords a criminal defendant the fundamental right to a fair opportunity to present a defense. *Crane v. Kentucky*, 476 U.S. 683, 690–91, 106 S.Ct. 2142, 2146–47, 90 L.Ed.2d 636 (1986); *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973); *Beaty v. Commonwealth*, Ky., 125 S.W.3d 196, 206 (2003). The exclusion of evidence violates that constitutional right when it "significantly undermine[s] fundamental elements of the defendant's defense." *United States v. Scheffer*, 523 U.S. 303, 315, 118 S.Ct. 1261, 1267–68, 140 L.Ed.2d 413 (1998). This includes the right to introduce evidence that someone other than the accused, *i.e.*, an alleged alternative perpetrator ("aaltperp") committed the crime. *Beaty, supra,* at 207; *Harvey v. Commonwealth*, 266 Ky. 789, 100 S.W.2d 829, 830 (1937). However, in cases where this Court or its predecessor have addressed the issue, the defendant has always been able to identify a specific person who may have committed the crime. *Beaty, supra,* at 208 (evidence that another person had both motive and op-portunity to commit crime); *Eldred v. Commonwealth*, Ky., 906 S.W.2d 694, 705 (1994) (evidence of intimidation of a witness by aaltperp's boyfriend to prove that aaltperp committed the crime), *abrogated on other grounds by Commonwealth v. Barroso*, Ky., 122 S.W.3d 554, 564 (2003). *See also Harvey, supra,* at 830 (evidence that brother-in-law of the deceased actually fired the fatal shot); *Franklin v. Commonwealth*, 105 Ky. 237, 48 S.W. 986, 989 (1899) (evidence that someone else had the same motive as accused to kill victim).

In this case, Appellant does not identify any *specific* person who had a motive to kill Reed. He only asserts that if Reed were involved in the drug trade, *many* other people may have wanted to kill him. Nor can Appellant identify a specific motive as to why someone else would want to kill Reed other than the general statement that the drug trade frequently involves violence. Other states that have considered similar arguments have held that a direct connection must exist between the aaltperp and the offense charged in order for the evidence to be admissible. *People v. Jackson*, 110 Cal.App.4th 280, 1 Cal. Rptr.3d 561, 565 (2003) ("[E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime."); *State v. Ortiz*, 252 Conn. 533, 747 A.2d 487, 509 (2000) ("[U]nless that direct connection exists it is within the sound discretion of the trial court to refuse to admit such evidence when it simply affords a possible ground of suspicion against another person." (citations omitted)).

Thus, in *People v. Edelbacher*, 47 Cal.3d 983, 254 Cal.Rptr. 586, 766 P.2d 1, 21 (1989), evidence that the victim had sold

drugs and had friends who were "Hell's Angel-type people" was properly excluded as too remote to show a reasonable possibility that a third person committed the crime. As here, it was argued that "people who are dealing in narcotics frequently end up injured or shot." *Id.* The court held:

> [The] proposed evidence did not identify a possible suspect other than defendant or link any third person to the commission of the crime.... [E]vidence of a third party's motive, without more, is inadmissible. A fortiori, evidence showing only a third party's possible motive is not capable of raising a reasonable doubt of a defendant's guilt and is thus inadmissible.

*Id.* See also *United States v. DeNoyer,* 811 F.2d 436, 440 (8th Cir.1987) (evidence that other deviate sex offenders were operating in the community property excluded as remote, speculative, and "pure red herring"); *State v. Giguere,* 184 Conn. 400, 439 A.2d 1040, 1042–43 (1981) (evidence of several other assaults against women in the same neighborhood during the same time period properly excluded as merely implying possible suspicion against another person); *People v. Kent,* 157 Mich.App. 780, 404 N.W.2d 668, 674 (1987) (evidence that three other fires occurred at approximately same time as principal fire, without any facts suggesting that someone else set the other fires, properly excluded as raising mere suspicion that someone other than defendant set the principal fire); *State v. Koedatich,* 112 N.J. 225, 548 A.2d 939, 979 (1988) (evidence of obscene phone calls made to pay phone outside cheerleaders' locker room and that murder victim was a cheerleader properly excluded as only raising suspicion); *State v. Denny,* 120 Wis.2d 614, 357 N.W.2d 12, 17–18 (1984) (evidence that murder victim may have gotten into trouble with major drug dealer, that victim owed another person

$130.00, that victim may have had an enemy, that person gave victim a shotgun in exchange for drugs, and that the victim sold the shotgun, all properly excluded for failure to show motive, opportunity, or a direct connection with the crime).

As Appellant was unable to establish a direct connection between the crime and any specific person with a motive to kill Reed, the exclusion of the proffered evidence of Reed's involvement with drugs did not deprive Appellant of his constitutional right to present a defense.

## IV. REPLAY OF TESTIMONY DURING DELIBERATIONS.

■ In relating the statements made to him by Appellant, Jeremiah Sullivan testified that Appellant told him that he had fired "seven to nine" shots at the Reed vehicle, but admitted on cross-examination that he told the police that Appellant claimed to have fired "six to eight" shots. Sullivan also testified that he had not talked to Fee prior to being interviewed by the police on September 17, 2001. However, he later returned to the witness stand and admitted that, in fact, he had spoken with Fee prior to his police interview. On this occasion, he testified on direct examination that Fee had only told him that Reed was driving the car, and gave him no other details about the shooting. On cross-examination, however, defense counsel impeached Sullivan by reading back the portion of his written statement where he stated that Fee told him, "Man, they just came out of nowhere. Starting riding on us, chasing us. And then that's when they started firing." Nothing was said during Sullivan's second appearance on the witness stand about anything Appellant had told him or how many shots had been fired.

During deliberations, the jury sent a note to the trial judge asking: "Did Jeremiah (on the 17th police statement) say that Tamonte [sic] said he had fired 6–7 shots? Or was this just said on the witness stand?" The trial judge responded that he could not tell them the answer to the question, but that he could replay Sullivan's testimony for them. He informed them that they would need to watch both the direct and cross-examination if they chose that option. The jury opted to listen to the testimony and viewed the entirety of the testimony given by Sullivan on his first appearance as a witness; however, the judge overruled Appellant's motion to replay Sullivan's testimony from his second appearance. Appellant asserts that Sullivan and Fee may have conspired to "frame" him before Sullivan went to the police; thus, it was reversible error not to replay the testimony in which Sullivan admitted to talking to Fee before going to the police. (The jury did not request a replay of that testimony.)

■ The decision with respect to how much testimony to read or replay to the jury is within the sound discretion of the trial court and will not be overturned absent a clear abuse of discretion. *Baze v. Commonwealth*, Ky., 965 S.W.2d 817, 825 (1997). In exercising that discretion, the judge must balance the risk of emphasizing particular testimony against the need to obviate juror confusion. *Bellamy v. Pathak*, Ky.App., 869 S.W.2d 45, 47 (1993) (citing *Smith v. Wright*, Ky., 512 S.W.2d 943, 947 (1974)). A trial judge is only required to provide the jury with the requested portion of the testimony and has a duty to ensure that the trial is not unnecessarily prolonged. *Jarvis v. Commonwealth*, 245 Ky. 790, 54 S.W.2d 307, 310 (1932). A judge need not replay cross-examination when the answer to the jury's question lies in testimony given during direct examination. *Johnson v. Commonwealth*, Ky., 497 S.W.2d 699, 700 (1973). In fact, if portions that the jury have not requested are read back, it may prejudice the appellee's interests, as it would unduly emphasize that testimony. *Humana, Inc. v. Fairchild*, Ky.App., 603 S.W.2d 918, 921 (1980). Here, the trial judge replayed only the portion of the testimony that the jurors requested, *i.e.*, the portion that contained the answer to their question. We perceive no abuse of discretion.

## V. FAILURE TO EXCUSE JUROR FOR CAUSE.

■ During voir dire, Juror 194 advised that her husband is a police officer and that he was a friend of the officer who was the lead investigator on this case. She said that she did not know the officer personally, and was not familiar with the case because she and her husband were out of town when the shooting occurred. She also said that she and her husband do not discuss his work and that she believed she could be impartial. Appellant's counsel moved to strike Juror 194 for cause based on these facts and asserts as error on appeal the trial judge's denial of his motion.

This is a non-issue. Juror 194 did not sit as a juror on this case, and Appellant did not use a peremptory strike to excuse her. *Thomas v. Commonwealth*, Ky., 864 S.W.2d 252, 259 (1993). The record indicates that, after voir dire of the initial panel, the panel was reduced to thirty-three potential jurors by random selection, and that Juror 194 was one of those jurors excused by that process. Therefore, no prejudice resulted from the failure to strike her for cause.

## VI. BATSON ISSUE.

■ The Commonwealth removed three of the five African–American mem-

bers of the jury panel by peremptory strikes. Appellant's counsel claimed a so-called "*Batson* violation." *Batson v. Kentucky,* 476 U.S. at 79, 106 S.Ct. at 1712. The trial judge asked the prosecutor to explain why the Commonwealth had peremptorily excused the three African-American jurors. The prosecutor replied that she struck Juror 164 because he had stated that he had strong feelings about people carrying unlicensed firearms. One of the Commonwealth's key witnesses, Fee, was carrying an unlicensed firearm when Reed was killed, and the prosecutor feared that Juror 164 might be prejudiced against him. Next, the prosecutor explained that she struck Juror 221 because she had served the previous week as a juror on another criminal case in which the defendant had been acquitted, and that she had also struck several Caucasian jurors from this jury for the same reason. Appellant does not complain on appeal about the removal of Jurors 164 and 221.

However, Appellant does challenge the removal of Juror 141. When asked if anyone was familiar with the case, Juror 141 stated that she had grown up on the side of town where the shooting occurred and that her husband had driven near the area on September 15, 2001. When he arrived at home and informed her that a shooting had occurred on Merino Street, they decided to return to the scene to look around and "meddle." However, the crime scene had been cleared by the time they arrived, and they did not talk to anyone there about the shooting. Juror 164 also recognized the name of one of the eyewitnesses because her son-in-law has a garage in the witness's neighborhood and she had observed the witness sitting outside on her porch. However, she had never spoken to the witness and had never had any problems with her. She believed that she could remain impartial and consider the evidence from both sides. The prosecutor explained that she struck Juror 164 be-cause she found her personal desire to investigate the scene of the crime to be "curious" and "odd." The trial judge accepted this explanation as "race-neutral." Appellant asserts that the prosecutor excused this juror for a discriminatory purpose and that the purported reason given for the strike was a pretext.

■■■■■ *Batson* established a three-part test to determine whether the prosecution has removed potential jurors solely on the basis of race. First, the defendant must make a *prima facie* showing of purposeful discrimination. *Id.* at 96–97, 106 S.Ct. at 1723. Generally, numbers alone are insufficient to satisfy this step, but if the prosecution offers a race-neutral reason and the trial judge rules on the issue, the issue of whether a *prima facie* showing was made is, as here, mooted. *Commonwealth v. Snodgrass,* Ky., 831 S.W.2d 176, 179 (1992) (citing *Hernandez v. New York,* 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991)).

■■■■■ The second step requires the prosecutor to provide a race-neutral reason for the strike. *Batson, supra,* at 97, 106 S.Ct. at 1723. The explanation given during the second step need not be persuasive, or even plausible, nor does it need to rise to the level of a challenge for cause. It must simply be facially valid. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam) (citing *Hernandez, supra,* at 374, 111 S.Ct. at 1874). Here, the Commonwealth offered facially valid reasons for all three peremptory strikes; thus, this aspect of the test was satisfied.

■■■■■ The third step requires the trial judge to determine whether the defendant has met the burden of showing intentional discrimination. *Batson, supra,* at 98, 106 S.Ct. at 1724. During this step,

the trial judge must evaluate the reasons offered by the prosecutor to determine if they are valid and neutral and not simply a pretext for discrimination. *Gamble v. Commonwealth*, Ky., 68 S.W.3d 367, 371 (2002). The trial judge's decision is accorded great deference on this issue because the judge is in the best position to evaluate the credibility and demeanor of the prosecutor. *Hernandez, supra*, at 365, 111 S.Ct. at 1869. This decision will not be overturned unless it is clearly erroneous. *Stanford v. Commonwealth*, Ky., 793 S.W.2d 112, 114 (1990).

Appellant contends that the trial judge made no findings to meet the requirements of the third step. This is incorrect. The trial judge stated that while he did not believe that the Commonwealth's reason for striking Juror 141 would be grounds to excuse the juror for cause,[2] it was a sufficient reason to exercise a peremptory strike. We are unable to say that the trial judge was clearly erroneous in this finding. The fact that Juror 141 was sufficiently curious about the shooting to visit the crime scene may have reasonably led the prosecutor to question her ability to impartially consider the evidence. Nothing indicates that this reason was a pretext for discrimination, and the trial judge was entitled to believe the prosecutor's explanation based on his evaluation of the prosecutor's credibility and demeanor. *Hernandez, supra*, at 365, 111 S.Ct. at 1869.

Accordingly, the judgment of conviction and the sentence imposed by the Fayette Circuit Court are AFFIRMED.

All concur.

---

**2.** The trial judge was correct. *See Derossett v. Commonwealth*, Ky., 867 S.W.2d 195, 197 (1993) (juror having driven past the scene not grounds to strike for cause).